**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

**WALKER D. BOWEN, as the administrator of the estate of TERRANCE DESMOND BOWEN,**

**Plaintiff,**

**v.**

**BRUCE REX SCHOOLCRAFT, D.O.,**

**Defendant.**

**CIVIL ACTION NO. 5:13-CV-256 (MTT)**

## ORDER

Defendant Dr. Bruce Rex Schoolcraft has moved for summary judgment on the Eighth Amendment failure-to-protect claim asserted against him by Plaintiff Walker D. Bowen, the administrator of Terrance D. Bowen's estate. (Doc. 129). Schoolcraft's motion is **DENIED**.

## I. BACKGROUND

The Plaintiff filed this action pursuant to 42 U.S.C. § 1983 asserting claims arising out of the death of Terrence Bowen at the hands of inmate Carl Merkerson. (Doc. 1). Merkerson is, and was at the time he killed Bowen, a chronic paranoid schizophrenic and a Level III mental health inmate. (Docs. 89-4 at 4; 134-1 at 48:23-25). A Level III mental health inmate is one with a "tenuous mental status that is easily overwhelmed by everyday pressures, demands, and frustrations resulting in … disorganization, impulsive behavior, poor judgment, a deterioration of emotional

controls, loosening of associations, delusional thinking, and/or hallucinations." (Doc. 148-3 at 43).

On January 3, 2010, Merkerson, who was then at Valdosta State Prison, assaulted his cellmate because he thought the cellmate was removing and reattaching Merkerson's body parts. (Docs. 139-2 ¶ 2; 146-2 at 3; 148-3 at 76-77, 88). Merkerson was then involuntarily placed on medication and transferred to Baldwin State Prison. (Docs. 129-2 ¶ 2; 139-2 ¶ 2; 148-3 at 88).

On February 26, 2010, Merkerson assaulted his cellmate in an altercation characterized as a "high assault without weapon." (Doc. 89-4 at 7, 11). On March 2, 2010, Merkerson's mother called Pat Tyler, Merkerson's mental health counselor, to express her concern that her son was decompensating, becoming increasingly paranoid, and not taking his antipsychotic medication. (Docs. 129-2 ¶¶ 3, 7; 139-2 ¶¶ 3, 7; 148-1 at 128:17-129:8; 148-3 at 6). Tyler testified that on that same day, she discussed her conversation with Mrs. Merkerson at Merkerson's treatment team meeting. (Doc. 148-1 at 129:22-24).

After the treatment team meeting, Tyler requested that Merkerson be assessed by a psychiatrist, and she attempted to have Merkerson, who was housed in a double-man cell, placed in a single-man cell, but an accounting clerk told her there were no available cells. (Docs. 129-3 ¶ 9; 148-1 at 41:17-19; 148-3 at 6, 13). Tyler also added the following note to Merkerson's mental health chart:

> Received telephone call from Gloria Merkerson inmate's mother. … She is concerned [because] her son is increasingly paranoid and abruptly ended their visit this past weekend [because] "people are watching me." He also informed her that people were putting toilet water in his food and stealing his mojo at night while he sleeps. She reports that he only becomes paranoid when not taking his meds and that his crime, murder, was

> committed after the psych hospital released him after 5 days when she attempted to place him there involuntarily.

(Doc. 148-3 at 6).

Schoolcraft, a psychiatrist at Baldwin State Prison, testified that he was not at this meeting, but he performed the requested psychiatric assessment. (Docs. 129-3 ¶ 8; 146-1 at 22:21-24, 49:23-50:2; 148 at 33). Schoolcraft testified that prior to meeting with Merkerson, he reviewed Merkerson's medical records. (Docs. 129-2 ¶ 9; 139-2 ¶ 9; 146-1 at 25:9-17). However, Schoolcraft claims that he did not review Tyler's note about her conversation with Mrs. Merkerson, the conversation that led to Schoolcraft's assessment, and he says he never spoke with Tyler or Mrs. Merkerson. (Docs. 139-2 ¶ 9; 146-1 at 22:15-20, 23:4-7, 40:6-8). But Schoolcraft overheard, in passing, that Mrs. Merkerson called to say her son "wasn't doing well[ and] doubted if he's taking his medicine," and he made a mental note to check Merkerson's medication administration record. (Doc. 146-1 at 61:21-63:13). According to Schoolcraft, the medication administration record indicated Merkerson's medication was being administered to him. (*Id.* at 16:8-16). The Plaintiff disputes that Merkerson was actually taking his medication. (Doc. 139-2 ¶ 19).

At the March 4, 2010 assessment, Schoolcraft discussed with Merkerson his assault of his cellmate at Valdosta State Prison and his delusion that the cellmate was cutting "his feet and penis off and reattach[ing] them." (Docs. 146-1 at 13:23-14:4; 146-2 at 3). However, according to Schoolcraft's progress notes and deposition testimony, Merkerson denied that he was, at the time, having delusions, experiencing agitation, or hearing voices, and to Schoolcraft, Merkerson did not appear to be suffering from delusions, agitation, or auditory hallucinations. (Docs. 146-1 at 72:1-8, 136:1-10; 146-2

at 3). Schoolcraft thought that Merkerson's medication appeared to be working. (Docs. 146-1 at 72:16-18; 146-2 at 3). Merkerson also did not report any agitation or make any comments about problems with any inmate. (Doc. 146-1 at 44:12-21). As a result of his assessment, Schoolcraft recommended they meet once a month for medication and behavior management instead of every other month. (Doc. 146-2 at 3). Schoolcraft also noted that he would reconsider Merkerson's involuntary medication status if he refused treatment. (*Id.*).

After his assessment, Schoolcraft did not instruct that Merkerson was to be housed alone or placed in the crisis stabilization unit, which is for inmates "having a mental health crisis and need[ing] to be under … observation." (Docs. 146-1 at 44:22-45:16; 148-1 at 16:17-20). In fact, Schoolcraft's note makes no mention of Merkerson's housing assignment. (Doc. 146-2 at 3).

Nevertheless, Schoolcraft testified in his deposition that "it was evident" from his conversation with Merkerson and his status as a Level III mental health inmate that Merkerson was in a single-man cell. (Doc. 146-1 at 24:14-24). Again, it is undisputed that Merkerson was housed in a double-man cell, although he was the only occupant at the time of Schoolcraft's assessment. (Docs. 129-2 ¶¶ 13, 24; 129-7 at 2; 139-2 ¶¶ 13, 24; 146-2 at 3). It is also undisputed that a "double-bunking" policy was in effect at the time of the events. (Doc. 141-3 at 5). The policy provided that Level III mental health inmates could be housed with other Level III mental health inmates, but any Level III inmate "charged with assault," like Merkerson, was to be housed alone. (*Id.*). But the policy also provided that "the demands of specific situations might result in placement contrary to these guidelines" and that "[i]t's the responsibility of [Mental Health] to

[e]nsure that the … criteria are considered in determining lockdown placement for MH/MR inmates, and [t]o relay this information to the appropriate institutional officer." (*Id.*). Deputy Warden Doug Underwood testified that he could not "recall at any time that Mental Health has made a [housing] recommendation and it hadn't … been followed through." (Doc. 149-1 at 27:4-6).

On March 7, 2010, Bowen was assigned to Merkerson's cell. (Docs. 129-2 ¶ 24; 129-7 at 2; 139-2 ¶ 24). On March 9, 2010, Merkerson, believing Bowen was stealing and removing his body parts, brutally murdered Bowen. (Docs. 89-4 at 1, 3; 129-2 ¶ 25; 139-2 ¶ 25; 146-2 at 4). It is undisputed Schoolcraft was not notified that Bowen was placed in Merkerson's cell prior to the assault. (Docs. 129-2 ¶ 23; 139-2 ¶ 23). Schoolcraft assessed Merkerson after the assault and stated in his notes that "Inmate needs to always be housed alone." (Doc. 148-3 at 36). He also ordered that Merkerson was to be placed in the crisis stabilization unit. (Docs. 146-1 at 159:11-160:1; 148-1 at 51:3-5).

## II. DISCUSSION

### A. Motion for Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant

may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

Once the movant makes the required showing, the burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are

jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

**B. Analysis**

The Plaintiff has asserted a failure-to-protect claim pursuant to 42 U.S.C. § 1983 against Schoolcraft, alleging he failed to protect Bowen from Merkerson. (Docs. 83; 139). Under the Eighth Amendment, prison officials have a duty to "'take reasonable measures to guarantee the safety of the inmates.'" *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). More to the point, they "'have a duty to protect prisoners from violence at the hands of other prisoners.'" *Id.* (quoting *Farmer*, 511 U.S. at 833) (internal quotation marks omitted). However, not every instance of violence between inmates "translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 833-34. To create a genuine issue of fact on a failure-to-protect claim, a plaintiff must provide sufficient evidence of "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (internal quotation marks omitted); *Losey v. Warden*, 521 F. App'x 717, 719 (11th Cir. 2013). The first element—risk of harm—is viewed objectively. *Caldwell*, 748 F.3d at 1099. The second element—whether the defendant was deliberately indifferent to that risk—has both a subjective and objective component: the plaintiff must show the defendant subjectively knew the inmate faced a substantial risk of serious harm and that the defendant disregarded that risk by not responding in an objectively reasonable manner. *Id.* As to the subjective

component, Schoolcraft must have been "aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed]" and must have also drawn the inference. *Farmer*, 511 U.S. at 837; *Caldwell*, 748 F.3d at 1099-1100. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Also, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

However, there are ways for prison officials to avoid Eighth Amendment liability; they can show:

> (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) "that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted."

*Rodriguez v. Sec. for Dep't of Corr.*, 508 F.3d 611, 617-18 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844).

Schoolcraft does not challenge the existence of a substantial risk of serious harm, but he does argue that he was not subjectively aware of this risk.[1] (Doc. 129-1 at 12). The Plaintiff contends Schoolcraft was subjectively aware of a substantial risk of harm because he was aware that Mrs. Merkerson warned about her son's decompensation and that "Merkerson's paranoid suspiciousness was directed to cellmates." (Doc. 139 at 6, 8). Relying on *Carter v. Galloway*,[2] Schoolcraft responds that while the evidence may demonstrate his "generalized awareness" of Merkerson's

[1] Schoolcraft does not argue that he was aware of the underlying facts but unsoundly believed "that the risk to which the facts gave rise was insubstantial or nonexistent." *Rodriguez*, 508 F.3d at 618.

[2] 352 F.3d 1346 (11th Cir. 2003).

history, the evidence is insufficient to establish the requisite subjective awareness. (Docs. 129-1 at 10; 160 at 9-10).

In *Carter*, the plaintiff, after being assaulted and stabbed by his cellmate, asserted a failure-to-protect claim. 352 F.3d at 1346. The evidence showed that the defendants "clearly knew that [the cellmate] was a 'problem inmate' with a well-documented history of prison disobedience and had been prone to violence." *Id.* at 1349. The evidence also showed that the plaintiff told the defendants his cellmate was acting crazy like a "caged animal" and threatening to hang himself. *Id.* at 1348. However, the plaintiff never informed the defendants that he feared his cellmate or that his cellmate threatened him. *Id.* at 1349. Affirming summary judgment for the defendants, the Eleventh Circuit concluded this was insufficient evidence to create a genuine issue of fact regarding whether the defendants were subjectively aware of a substantial risk of harm to the plaintiff. *Id.* at 1350. The Court reasoned that the evidence simply showed the defendants had a "generalized awareness of risk" and an awareness of the cellmate's "generally problematic nature." *Id.* at 1349-50. But this did not rise to the requisite "level of culpability." *Id.* at 1349.

In this case, the evidence shows that Schoolcraft's subjective awareness was significantly more than that of the defendants in *Carter*. Indeed, "[f]ar from a generalized awareness of Merkerson's propensity to misbehave, [the evidence] indicates a degree of specificity in the risk of harm posed to [any cellmate] that simply was not present in *Carter*." *Bowen v. Warden Baldwin State Prison*, __F.3d__, 2016 WL 3435501, at *6 (11th Cir. 2016). Specifically, because Schoolcraft testified that he reviewed Merkerson's medical records, a reasonable jury could find that he saw Tyler's

note that Mrs. Merkerson warned of her son's decompensation, namely his increased paranoia. (Docs. 139-2 ¶ 9; 146-1 at 23:4-7, 25:9-17). Moreover, Schoolcraft's testimony and his own notes from his meeting with Merkerson demonstrate that Schoolcraft was aware Merkerson was a chronic paranoid schizophrenic and would have specific delusions his cellmates were cutting off his body parts and reattaching them. (Docs. 146-1 at 29:22-30, 31:6-21:4, 48:23-25, 72:22-24; 146-2 at 3). And Schoolcraft testified that Merkerson's "record indicated that he had been assaultive to prior … cellmates." (Doc. 146-1 at 9:11-15). Thus, even if Merkerson was not exhibiting alarming symptoms of his mental condition during his meeting with Schoolcraft, it can reasonably be inferred that Schoolcraft "understood the volatile and dangerous nature of Merkerson's mental condition" from which he would suffer "violent delusions" about cellmates, "auditory hallucinations, and impulsive tendencies." *Bowen*, __F.3d__, 2016 WL 3435501, at *6.

Therefore, from this evidence, if believed, a jury could find that Schoolcraft was not merely aware of Merkerson's "generally problematic nature," but also that he was subjectively aware that Merkerson posed a substantial risk of harm to any cellmate.[3] The Court emphasizes that the law does not require that Schoolcraft be subjectively

[3] Although not a factor at this point, it is noteworthy that other mental health workers on Merkerson's treatment team, who are not parties to this suit, have acknowledged that they were aware Merkerson was in a double-man cell and that he would be a threat to an inmate assigned to the cell. Tyler, the mental health counselor who fielded Mrs. Merkerson's call and requested Schoolcraft's assessment, unsuccessfully tried to get Merkerson transferred to a single-man cell. (Docs. 129-3 ¶ 9; 148-3 at 6, 13). Tyler was not asked in her deposition if she discussed her efforts to have Merkerson transferred to a single-man cell with Schoolcraft. Melissa Register, who was Schoolcraft's supervisor, knew about Tyler's efforts to get Merkerson assigned to a single-man cell. (Docs. 145-1 at 8:24-25; 148-1 at 132:5-11). Register also was not asked in her deposition if she discussed Tyler's failed efforts with Schoolcraft, who, according to the evidence, could have ensured that Merkerson be housed alone. (Doc. 149-1 at 27:4-6). Given that Mrs. Merkerson's telephone call so alarmed mental health personnel that they requested a psychiatric assessment and tried to get Merkerson moved to a single-man cell, it seems likely they would have discussed Merkerson's housing situation with Schoolcraft. Indeed, it is apparent that the potential threat Merkerson posed to a cellmate was a reason for Schoolcraft's assessment.

aware Merkerson posed a substantial risk of harm to Bowen specifically. *See Farmer*, 511 U.S. at 843 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. … [I]t does not matter … whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his position face such a risk."); *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995).

Schoolcraft next contends that even if he were subjectively aware of a substantial risk of harm, there is no evidence he failed to respond in an objectively unreasonable manner. (Doc. 129-1 at 13). "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly declined to act or if he knew of ways to reduce the harm but recklessly declined to act." *Rodriguez*, 508 F.3d at 620 (internal quotation marks and citation omitted). Specifically, Schoolcraft argues there is no genuine issue of fact as to this element because he "was never informed that Inmate Bowen would be housed with Inmate Merkerson." (Doc. 129-1 at 13-14). Again, it is not necessary that the Plaintiff establish that Schoolcraft knew that Bowen specifically would be housed with Merkerson. Schoolcraft's real argument, adjusted to the facts, is that Merkerson was in a single-man cell, and thus would not have a roommate, and thus there was no reason for him to respond to the threat Merkerson posed to a cellmate. Actually, Merkerson was in a double-man cell, and nothing in Schoolcraft's notes from his encounter with Merkerson suggests otherwise. (Doc. 146-2 at 3). Only in his long-after-the-fact deposition testimony does Schoolcraft

contend that he thought Merkerson was in a single-man cell. (Doc. 146-1 at 24:14-24). Based on this evidence, a jury could reasonably conclude that Schoolcraft, like the rest of the treatment team, was aware that Merkerson was in a double-man cell, that he was aware another inmate could be assigned to the cell, and that because he took no action to prevent that, Bowen was put in the cell with Merkerson.

Nor does the policy providing that Level III mental health inmates charged with assault are to be housed alone establish as a matter of law that Schoolcraft did not know that a cellmate could be assigned to the double-man cell. (Doc. 141-3 at 5). On the contrary, the policy also provides that "the demands of specific situations might result in placement contrary to these guidelines" and that "[i]t's the responsibility of [Mental Health] to[ e]nsure that the … criteria are considered in determining lockdown placement for MH/MR inmates, and [t]o relay this information to the appropriate institutional officer." (*Id.*). Therefore, there is a genuine issue of fact whether Schoolcraft knew Merkerson could be housed with a cellmate.

Further, there is evidence that Schoolcraft was aware he could take steps to ensure Merkerson was always housed alone. Indeed, after the assault, Schoolcraft assessed Merkerson and noted that he "needs to always be housed alone" and then ordered that he be admitted into the crisis stabilization unit. (Docs. 146-1 at 159:11-160:1; 148-3 at 36). And Deputy Warden Underwood testified that he could not "recall at any time that Mental Health has made a [housing] recommendation and it hadn't … been followed through." (Doc. 149-1 at 27:4-6). Yet, despite evidence Schoolcraft was aware, because he reviewed Merkerson's chart and heard staff discussing the matter, that Mrs. Merkerson had recently warned Merkerson may be decompensating, that

Merkerson had violent delusions directed at cellmates, that he had assaulted at least one cellmate because of his delusion, and that he could be again housed with a cellmate, there is no evidence that Schoolcraft took any action to ensure that Merkerson was always housed alone until after Merkerson killed Bowen. Consequently, there is a genuine issue of fact whether Schoolcraft responded to the known risk of harm in an objectively unreasonable manner by knowingly or recklessly declining to act, despite his knowledge of ways to reduce the harm.[4]

Next, Schoolcraft makes a causation argument, arguing the Plaintiff has failed to show that he was "involved in decisions regarding the housing of inmates, ha[d] the authority to transfer or isolate inmates without cause, or otherwise had the authority to control the placement of Inmate Bowen and Inmate Merkerson." (Doc. 129-1 at 15-16). To determinate causation, "the critical question is whether [the defendant] was in a position to take steps that could have averted the … incident … but, through [deliberate] indifference, failed to do so." *Rodriguez*, 508 F.3d at 622 (third and fourth alterations in original) (internal quotation marks and citation omitted). The Court looks to Schoolcraft's "duties, discretion and means." *Id.* (internal quotation marks and citation omitted). The Eleventh Circuit has further stated:

> [A] plaintiff demonstrates the "necessary causal link" in this context where he is able to show that the prison official (1) "had the means substantially to improve" the inmate's safety, (2) "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence," and (3) had "other means [ ] available to him which he nevertheless disregarded."

---

[4] Schoolcraft also argues he responded reasonably because he "recommended that Inmate Merkerson be seen monthly as opposed to every [other] month and directed the mental health counseling staff to keep a close eye on Inmate Merkerson." (Docs. 129-1 at 14; 146-1 at 61:13-17). However, given his non-action regarding Merkerson's housing placement, this evidence does not demonstrate there is no genuine issue of fact whether Schoolcraft responded reasonably to his knowledge of a substantial risk of harm to any cellmate.

*Id.* (second and third alterations in original) (citation omitted).

As discussed, Deputy Warden Underwood testified that he could not "recall at any time that Mental Health has made a [housing] recommendation and it hadn't … been followed through." (Doc. 149-1 at 27:4-6). And, again, the "double-bunking" policy placed the responsibility on Mental Health to ensure that the criteria in the policy were considered when determining the placement of Level III mental health inmates. (Doc. 141-3 at 5). Finally, after the assault, Schoolcraft saw to it that Merkerson was housed alone and admitted him into the crisis stabilization unit. (Docs. 146-1 at 159:11-160:1; 148-1 at 51:3-5; 148-3 at 36). Clearly, a reasonable jury could find that Schoolcraft was in a position to take action regarding Merkerson's housing placement that would have averted the assault on Bowen but disregarded the means available to him to take action. Put another way, a reasonable jury could find the "necessary causal link" from this evidence—namely, that Schoolcraft "had the means substantially to improve … safety" to any potential cellmate of Merkerson's, "knew that the actions he undertook would be insufficient to provide [any cellmate] with reasonable protection from violence," and "had other means [ ] available to him which he nevertheless disregarded." *Rodriguez*, 508 F.3d at 622 (second alteration in original) (internal quotation marks and citation omitted). Thus, there is a genuine issue of fact whether Schoolcraft's failure to take any action to ensure that Merkerson was always housed alone caused Bowen's death.

Accordingly, because there are genuine issues of material fact as to each element of the Plaintiff's failure-to-protect claim, Schoolcraft is not entitled to summary judgment.

## III. CONCLUSION

For the foregoing reasons, Schoolcraft's motion for summary judgment is **DENIED**. (Doc. 129).

**SO ORDERED**, this 27th day of July, 2016.

S/ Marc T. Treadwell
MARC T. TREADWELL
UNITED STATES DISTRICT COURT